# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROBERT FRIEDMAN, individually and on behalf of other similarly situated persons, | Case No. _____ |
| *Plaintiff*, | **CLASS ACTION COMPLAINT** |
| vs. | **JURY TRIAL DEMANDED** |
| REAL ESTATE BOARD OF NEW YORK, DOUGLAS ELLIMAN, INC., CHRISTIE'S INTERNATIONAL REAL ESTATE LLC, THE CORCORAN GROUP, INC., SOTHEBY'S INTERNATIONAL REALTY AFFILIATES LLC, BROWN HARRIS STEVENS, LLC, SERHANT LLC, COMPASS, INC., NEST SEEKERS LLC, THE AGENCY IP HOLDCO, LLC d/b/a THE AGENCY RE, ELEGRAN LLC, ENGEL & VOLKERS NEW YORK REAL ESTATE LLC, R NEW YORK, ANYWHERE REAL ESTATE, INC., TERRA HOLDINGS, LLC and LESLIE J. GARFIELD & CO., INC. | |
| *Defendants* | |

1

Plaintiff Robert Friedman ("Plaintiff"), by and through his undersigned attorneys, individually and on behalf of all others similarly situated, brings this class action against the Real Estate Board of New York, Douglas Elliman, Inc., Christie's International Real Estate LLC, The Corcoran Group, Inc., Sotheby's International Realty Affiliates LLC, Brown Harris Stevens, LLC, Serhant LLC, Compass, Inc., Nest Seekers LLC, The Agency IP Holdco, LLC d/b/a The Agency RE, Elegran LLC, Engel & Volkers New York Real Estate LLC, R New York, Anywhere Real Estate, Inc., Terra Holdings, LLC, and Leslie J. Garfield & Co., Inc. (collectively, "Defendants") for violations of federal and state antitrust laws.

## I.    INTRODUCTION

1.    This lawsuit arises out of a horizontal antitrust conspiracy among major residential real estate firms not to compete over broker commissions in Brooklyn's most expensive neighborhoods ("REBNY Brooklyn").  Defendants perpetrated this conspiracy through the Real Estate Board Of New York ("REBNY"), New York City's premier real estate trade organization. As REBNY members, Defendants devised and agreed in writing to a set of rules (the "Broker Commission Allocation Rules," defined below) requiring a real estate broker representing a home seller (the "Seller Broker") to split the commission from a real estate transaction equally with the broker representing the home buyer (the "Buyer Broker")—a commission that must be paid by the home seller.

2.    The Broker Commission Allocation Rules caused sellers of real estate in REBNY Brooklyn to pay supracompetitive prices for real estate broker services.  This action is on behalf of Plaintiff and all persons or entities that sold residential real estate in REBNY Brooklyn in the last four years using the services of a Broker Defendant (defined below) and paid a Buyer Broker commission in accordance with the REBNY Rules (defined below).

3.      The Broker Commission Allocation Rules also require Defendants to list residential properties for sale in REBNY Brooklyn on the REBNY Residential Listing Service (the "RLS")—a database accessible only to those who agree to abide by the REBNY Rules—with blanket offers of Buyer Broker commissions at the time of listing.  This helps ensure that Defendants both dominate REBNY Brooklyn's residential real estate market and steer home buyers to listings with high Buyer Broker commissions.

4.      Defendants' conspiracy has artificially inflated broker commissions to a range of 5-6% of the sale price in nearly all residential real estate transactions in REBNY Brooklyn—half of which automatically goes to the Buyer Broker—an overcharge that is borne entirely by the home seller.  In a competitive market, the home seller negotiates and pays a fee to the Seller Broker, while the home buyer that employs the services of a broker negotiates and pays a fee to the Buyer Broker.  In a market unrestrained by the Broker Commission Allocation Rules, brokers would be forced to compete on price, and home sellers would pay substantially less in broker fees when selling residential real estate.

5.      In real estate markets outside the United States, home buyers pay the Buyer Broker, and broker commissions are substantially less than in REBNY Brooklyn.  And for homes sold *just outside* of REBNY Brooklyn, median Buyer Broker commissions are just 1%, far less than the 2.5-3% in REBNY Brooklyn.  Residential listings in those neighborhoods are dominated by another group of real estate brokers that owns and operates a different listing service, Brooklyn MLS, which, in contrast to REBNY, does *not* require a Seller Broker to offer *any* compensation to the Buyer Broker.

6.      Defendants' conspiracy has artificially inflated broker commissions in REBNY Brooklyn by hundreds of millions of dollars over the last four years at the expense of home sellers

who, under the REBNY Rules, are required to pay *both* the Buyer Broker and Seller Broker commissions.

7.      In the wake of regulatory scrutiny and antitrust allegations surrounding mandatory Buyer Broker commissions, REBNY has recently admitted that its rules are not "efficient and fair" and vowed to "decouple" broker commissions and eliminate the mandatory 50/50 split, beginning January 1, 2024.  Despite these changes, the REBNY Rules will continue harming competition and home sellers.  Buyer Broker compensation will still be noted in blanket offers on RLS listings set and paid by the seller, presumably with input from the Seller Broker, which preserves the lack of price competition and fails to eliminate Buyer Broker steering.

## II.     PARTIES

### A.     Plaintiff

8.      Plaintiff Robert Friedman is, and at all times relevant was, an individual resident and citizen of Kings County, New York.  On or about December 9, 2020, Plaintiff entered into an exclusive listing agreement with Douglas Elliman concerning the sale of a property owned by Plaintiff located in the Park Slope neighborhood of Brooklyn.  The property was listed for sale on the RLS by Defendant Douglas Elliman in accordance with the listing agreement and REBNY Rules.  Upon selling the property on May 28, 2021, Plaintiff paid a total broker commission of 5.5%, half of which (2.75%) went to Defendant R New York, as the Buyer Broker, in accordance with the listing agreement and REBNY Rules.

### B.     Defendants

9.      Defendant REBNY is a private trade association comprised of a vast majority of New York's real estate agents and brokerages.  REBNY is headquartered at 570 Lexington Avenue, 2nd Floor, New York, New York 10022.  REBNY's membership includes brokerages

and residential real estate brokers, building owners, managers, and developers in the New York Residential Real Estate Brokerage Market, as well as agents operating in the New York Residential Real Estate Market.  REBNY members include 810 brokerage firms and 15,000 real estate professionals.

10.    Defendant Douglas Elliman is a real estate brokerage firm headquartered at 575 Madison Avenue, 3rd Floor, New York, New York 10022.  Douglas Elliman is a REBNY member and a member of the RLS.  Douglas Elliman is engaged in the sale of residential real estate in REBNY Brooklyn.

11.    Defendant Christie's International Real Estate LLC ("Christie's") is a real estate brokerage firm whose primary New York location can be found at One Rockefeller Plaza, Suite 2402, New York, New York 10020.  Christie's is a REBNY member and a member of the RLS. Christie's is engaged in the sale of residential real estate in REBNY Brooklyn.

12.    Defendant The Corcoran Group, Inc. ("Corcoran") is a real estate brokerage firm headquartered in New York City at 590 Madison Avenue, 8th Floor, New York, New York 10022. Corcoran is a REBNY member and a member of the RLS.  Corcoran is engaged in the sale of residential real estate in REBNY Brooklyn.

13.    Defendant Sotheby's International Realty Affiliates LLC ("Sotheby's") is a real estate brokerage firm headquartered at 650 Madison Avenue, 2nd Floor, New York, New York 10153.  Sotheby's is a REBNY member and a member of the RLS.  Sotheby's is engaged in the sale of residential real estate in REBNY Brooklyn.

14.    Defendant Brown Harris Stevens, LLC ("Brown Harris Stevens") is a real estate brokerage firm headquartered at 770 Lexington Avenue, 4th Floor, New York, New York 10065. Brown Harris Stevens is a REBNY member and a member of the RLS.  Brown Harris Stevens is

engaged in the sale of residential real estate in REBNY Brooklyn. In January 2022, Brown Harris Stevens acquired Christie's New York City brokerage.

15. Defendant Serhant LLC ("Serhant") is a real estate brokerage firm headquartered at 372 West Broadway, New York, New York 10012. Serhant is a REBNY member and a member of the RLS. Serhant is engaged in the sale of residential real estate in REBNY Brooklyn.

16. Defendant Compass, Inc. ("Compass") is a real estate brokerage firm headquartered at 90 Fifth Avenue, 3rd Floor, New York, New York 10011. Compass is a REBNY member and a member of the RLS. Compass is engaged in the sale of residential real estate in REBNY Brooklyn.

17. Defendant Nest Seekers LLC ("Nest") is a real estate brokerage firm headquartered at 505 Park Avenue, New York, New York 10022. Nest is a REBNY member and a member of the RLS. Nest is engaged in the sale of residential real estate in REBNY Brooklyn.

18. Defendant The Agency IP Holdco, LLC, d/b/a The Agency RE, ("The Agency") is a real estate brokerage firm whose primary New York address can be found at 88 University Place, 3rd Floor, New York, New York 10003. It is headquartered in Beverly Hills, California. The Agency is a REBNY member (identified in the REBNY Directory as The Agency Brokerage). The Agency is engaged in the sale of residential real estate in REBNY Brooklyn.

19. Defendant Elegran LLC ("Elegran") is a real estate brokerage firm headquartered at 1407 Broadway, 26th Floor, New York, New York, 10018. Elegran is a REBNY member and a member of the RLS. Elegran is engaged in the sale of residential real estate in REBNY Brooklyn.

20. Defendant Engel & Volkers New York Real Estate LLC ("Engel & Volkers") is a real estate brokerage firm whose primary New York location is 430 Park Avenue, 11th Floor, New

6

York, New York 10022.  Engel & Volkers is a REBNY member and a member of the RLS.  Engel & Volkers is engaged in the sale of residential real estate in REBNY Brooklyn.

21.     Defendant R New York is a real estate brokerage firm headquartered at 641 Lexington Ave, New York, NY 10022.  R New York is a REBNY member and a member of the RLS.  R New York is engaged in the sale of residential real estate in REBNY Brooklyn.

22.     Defendant Anywhere Real Estate, Inc. (f/k/a Realogy Holdings Corp.) ("Anywhere") is a global brokerage franchiser and the parent company of Defendants Corcoran and Sotheby's. Anywhere is headquartered in Madison, NJ.

23.     Defendant Terra Holdings, LLC ("Terra") is a real estate services companies and the parent of Defendant Brown Harris Stevens.  Terra is headquartered at 770 Lexington Avenue, New York, NY 10065.

24.     Defendant Leslie J. Garfield & Co., Inc. ("Garfield") is a real estate brokerage firm headquartered at 505 Park Avenue, Suite 303, New York, New York 10153.  Garfield is a REBNY member and a member of the RLS.  Garfield is engaged in the sale of residential real estate in REBNY Brooklyn.

25.     Defendants Douglas Elliman, Christie's, Corcoran, Sotheby's, Brown Harris Stevens, Serhant, Compass, Nest, The Agency, Elegran, Engel & Volkers, R New York, Anywhere, Terra, and Garfield are collectively referred to herein as the "Broker Defendants."

26.     The Broker Defendants are not the only brokers engaged in the conspiracy alleged in this complaint.  As explained more fully below, each and every broker that represents home buyers or sellers in REBNY Brooklyn through RLS must agree to abide by the same anticompetitive restraints.  Accordingly, each and every other broker conducting residential real estate business in REBNY Brooklyn through RLS is a co-conspirator.

### III.     JURISDICTION AND VENUE

27.     This action arises under § 1 of the Sherman Act, 15 U.S.C. § 1, and §§ 4, and 16 of the Clayton Act, 15 U.S.C. §§ 15 & 26.  Plaintiff seeks damages for his injuries and those suffered by members of the Class, as defined below, resulting from Defendants' anticompetitive conduct that has raised the price of real estate commissions, including but not limited to Buyer Broker commissions, in REBNY Brooklyn.  The Broker Commission Allocation Rules (as defined *infra*) have been adopted, applied, and enforced in this District for the relevant period, and have been implemented by each Defendant in this District.  This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1337(a) (antitrust) and 28 U.S.C § 15 (antitrust).

28.     Defendants transact substantial business and engage in interstate trade and commerce in this District , including the extensive business of each of Defendants' real estate brokerage subsidiaries, franchisees, agents, and/or affiliates, which collectively transact business in this District and are involved in a significant portion of real estate listings for REBNY Brooklyn properties on the RLS and sales of properties located in REBNY Brooklyn.  Venue is appropriate in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, which also provides for nationwide service of process in antitrust matters.

29.     In addition, this Court has jurisdiction over the subject matter of this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2).  The amount in controversy exceeds $5,000,000, exclusive of interest and costs, there are more than 100 members of the proposed class, and at least one member of the class is a citizen of a state different from Defendants.  This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

30.     This Court has personal jurisdiction over Defendants that: (i) transacted substantial business in this District; (ii) transacted business with members of the Class in this District; (iii) had substantial presence and contacts in this District; and (iv) committed unlawful acts in furtherance of their scheme in this District.

31.     Venue in this Court is also proper pursuant to 28 U.S.C. § 1391 because Defendants are residents of and/or do business in this District, have intentionally availed themselves of the laws and markets within this District by conducting substantial business in this District, and a significant portion of the facts and circumstances giving rise to this Complaint occurred in or emanated from this District.

## IV.     RELEVANT BACKGROUND AND DEFENDANTS' SCHEME

### A.     REBNY Brooklyn

32.     REBNY Brooklyn is a geographic area made up of the following Brooklyn neighborhoods: Brooklyn Heights, Park Slope, Cobble Hill, Carroll Gardens, Boerum Hill, Fort Greene, South Slope, DUMBO, Red Hook, Prospect Heights, Williamsburg, Greenpoint, Gowanus, Downtown Brooklyn, Clinton Hill, Bedford-Stuyvesant, Stuyvesant Heights, Bushwick, Crown Heights, and Prospect-Lefferts Gardens.  REBNY Brooklyn is often referred to in the real estate industry as "Prime Brooklyn," "Brownstone Brooklyn," or "Prime Brooklyn Neighborhoods" because the neighborhoods that constitute REBNY Brooklyn are expensive and accessible to Manhattan.

33.     REBNY Brooklyn is one of the largest and most expensive residential real estate markets in the United States, if not the world.  In 2022 alone, Brooklyn residential real estate sales reached nearly $8 billion, the vast majority of which occurred in REBNY Brooklyn.  REBNY Brooklyn also solidified its status as one of the few real estate markets in the country to regularly have individual home sales exceed $10 million.  In 2023, median residential sales prices in

REBNY Brooklyn ranged from $730,000 to $2,077,000.  And for Q3 2023, the median price per square foot ranged from $832 to $1,825.

34.     Residential real estate transactions in REBNY Brooklyn are dominated by the Broker Defendants, meaning that the vast majority of residential listings for sale in REBNY Brooklyn are controlled by the Broker Defendants who, as REBNY members, publish those listings on RLS.  Broker Defendants' REBNY Brooklyn listings on RLS almost always identify broker commissions ranging between 5% and 6%, half of which goes to the Seller Broker.  As the Consumer Federation of America ("CFA") stated in 2022, REBNY "dominates sales in . . . the brownstone areas of Brooklyn nearest Manhattan, [and] operates to an extent as a club with a norm that sales will be co-brokered for a total commission ranging from five to six percent."[1]

35.     REBNY Brooklyn's geographic scope has increased over time.  Until approximately 2010, REBNY Brooklyn was smaller, consisting of Brooklyn Heights, DUMBO, Cobble Hill, Boerum Hill, Carroll Gardens, Fort Greene, Park Slope, and Williamsburg.  But as those neighborhoods became saturated with REBNY-Broker facilitated sales that inflated commissions, the Broker Defendant pushed into adjacent neighborhoods like Downtown Brooklyn, Bedford Stuyvesant, Stuyvesant Heights, Bushwick, Gowanus, South Slope, Red Hook, Prospect Heights, and Greenpoint.  And once REBNY Brokers saturated *those* neighborhoods, they pushed their way into the Crown Heights and Prospect-Lefferts Gardens—neighborhoods further east and south into Brooklyn, but that are still accessible to Manhattan.  Each time the Broker Defendants annexed yet another neighborhood to REBNY Brooklyn, they raised real estate transaction costs by imposing supracompetitive broker fees.

---

[1] Stephen Brobeck, *Diverse Real Estate Commissions: The New York City Residential Brokerage Anomaly*, CFA (Oct. 19, 2022), https://consumerfed.org/wp-content/uploads/2022/10/Diverse-Real-Estate-Commissions-Report-10-19-22.pdf.

36.     Prior to REBNY's Brooklyn's expansion, those adjacent neighborhoods were dominated by a separate residential trade organization with its own listing service called Brooklyn MLS.  In stark contrast to REBNY, Brooklyn MLS does not require sellers or Seller Brokers to offer commissions to Buyer Brokers, and therefore Buyer Broker commissions are substantially lower than in REBNY Brooklyn, with a median of approximately 1%.

37.     Brooklyn MLS is currently concentrated in Brooklyn's southern and eastern neighborhoods that are further away from Manhattan, including Kensington, Midwood, Canarsie, Bay Ridge, Sheepshead Bay, Bensonhurst, Marine Park, Gravesend, Brighton Beach, and Coney Island.  Residential properties in these neighborhoods tend to cost significantly less than those in REBNY Brooklyn, and buyers are generally local to the area, rather than those looking to buy in Brooklyn as an alternative to Manhattan or those new to New York City.  Charles Olson, a residential broker who operates primarily in Brooklyn MLS territory and the founding member of Brooklyn-based Keller Williams Realty Empire, has described the Brooklyn real estate market as "two different camps . . . .  There's the Brooklyn MLS world and then you have the REBNY country."

38.     As REBNY Brooklyn has expanded its geographic scope beyond what is known in the real estate industry as "the Manhattan part of Brooklyn" (*i.e.*, the small handful of neighborhoods closest to Manhattan), the Broker Commission Allocation Rules (defined *infra*) and 5-6% commissions have come with it.  As Chris Thomas, Executive Vice President and Managing Director of Defendant Brown Harris Stevens Brooklyn has noted, over the last several years, there has been a "REBNY incursion into what used to be Brooklyn MLS strongholds."

**B.      Residential Real Estate Transactions in REBNY Brooklyn**

39.     Like most residential real estate transactions in the United States, those in REBNY Brooklyn typically occur between a homeowner selling a property (the "Seller") and a person who is buying the property (the "Buyer").

40.     Sellers and Buyers in REBNY Brooklyn are typically represented by one or more real estate agents who are licensed by the State of New York.   These real estate agents are themselves agents of a real estate broker (a real estate agent with additional licensure to oversee other real estate agents) and/or a brokerage firm.   As such, brokers and brokerage firms are legally responsible for the actions of their licensed real estate agents and other agents.

41.     Under New York law, only a licensed broker can be *paid* to represent a Seller or a Buyer in a residential real estate transaction.   For this reason, residential real estate brokerage contracts with Sellers and Buyers are with brokers, not agents, and all payments to individual realtors or agents pass through brokers.   The vast majority of Sellers and Buyers in REBNY Brooklyn, like those across the country, use a broker for residential real estate transactions.

42.     While the Seller and Buyer are typically represented by different real estate agents, in a given transaction, those agents can be employed by the same broker or brokerage firm.   This is called "dual agency."   Dual agency is permissible under New York law, although both the Seller and Buyer must knowingly agree to the arrangement.

43.     The Broker Defendants operate in REBNY Brooklyn as both Buyer Brokers and Seller Brokers.   As Buyer Brokers, they post listings for REBNY Brooklyn properties on the RLS. As Seller Brokers, they represent Buyers purchasing in REBNY Brooklyn.   And in certain transactions, the Broker Defendants may engage in "dual agency" when they have separate agents representing the Buyer and Seller in the same transaction.   Accordingly, the Broker Defendants

receive substantial compensation from transactions in which they and their agents serve as Buyer Brokers.

### C.    The RLS and Multiple Listing Services

44.    The vast majority of residential real estate transactions in the United States are facilitated through a Multiple Listing Service ("MLS").  An MLS is a centralized database of properties listed for sale that allows residential real estate brokers and agents to identify homes for sale within a certain geographic area.

45.    In REBNY Brooklyn, the dominant MLS is called the RLS.  Approximately 90% of homes sold in the United States were listed on an MLS.  A similar percentage of homes sold in REBNY Brooklyn were listed on the RLS.  As of the date of this complaint, approximately 90% (1,000 out of 1,107) of online residential listings in REBNY Brooklyn were listed on the RLS.

46.    Brokers rely heavily on MLSs.  Brokers for Sellers list properties on MLSs for sale, while Buyer Brokers use MLSs to search for available properties.  Access to and membership in an MLS is essential for brokers to conduct residential real estate business.  MLSs provide Seller Brokers the ability to efficiently broadcast and disseminate notice of a property for sale.  MLSs provide Buyer Brokers the ability to research and discover properties for sale in a particular area. If a property is not listed on an MLS, most Buyer Brokers are unlikely to discover that the property is for sale.

47.     Historically, Buyers could only find MLS-listed properties through their Buyer Broker.  But in recent years, Buyers themselves have been able to research properties for sale using free third-party websites or apps, such as Zillow, Redfin, Street Easy, and Trulia, that source listings from MLSs.  Buyers' ability to easily research MLS-listed properties through such

websites and apps has diminished the value of services provided by Buyer Brokers.  In a competitive market, this should lead to lower Buyer Broker fees.

      **D.**    **The REBNY Rules**

    48.    REBNY is the leading trade association for real estate brokers in New York City. REBNY used to be affiliated with the National Association of Realtors ("NAR").  But in 1994, its members seceded to form their own, New York-only association.

    49.    REBNY is comprised of six separate divisions.  The Residential Brokerage Division devises and promulgates the RLS Universal Co-Brokerage Agreement Rules and Regulations (the "REBNY Rules") (attached as Exhibit A) with approval from the Residential Brokerage Board of Directors, whose members include Defendants Douglas Elliman, Corcoran, Sotheby's, Brown Harris Stevens, Compass, R New York, and Garfield.[2]

    50.    All REBNY members, including the Broker Defendants, are required to, and did, agree to the REBNY Rules in writing, including the Broker Commission Allocation Rules, which govern residential real estate transactions in REBNY Brooklyn.  Defendants therefore not only knowingly agree to those rules, they had actual knowledge that all REBNY members knowingly agreed to them as well.

      **1.**    **The Buyer Broker Commission Rule**

    51.    The REBNY Rules require that, for each residential real estate transaction in REBNY Brooklyn, the Buyer Broker and Seller Broker each receive "an equal share [*i.e.*, half] of the commission," paid entirely by the Seller, regardless of the amount or quality of services that the Buyer Broker may provide in connection with the transaction (the "Buyer Broker Commission

---

[2] Notably, Defendants Compass, Corcoran, and Douglas Elliman alone dominate REBNY Brooklyn, accounting for at least 80% of closed residential sales in 2022.

Rule"). The Buyer Broker Commission Rule, as stated in Article IV, Section 1 of the REBNY

Rules, it set forth below:

> Commissions. With respect to the sale of an Exclusive Property [*i.e.*, a residential
> property listed on the RLS], if a sale is consummated with a Buyer procured by a
> Co-Broker, unless the Exclusive Listing specifies otherwise or absent some other
> written agreement between an Owner [*i.e.*, a Seller] and their Exclusive Broker(s),
> the Exclusive Broker [*i.e.*, the Seller Broker] and the Co-Broker [*i.e.*, the Buyer
> Broker] shall each be paid an equal share of the commission as specified in the
> Exclusive Listing . . . [once] the Exclusive Broker has received the commission
> [from the Seller].[3]

### 2. The Commission Reduction Rule

52.     A separate REBNY rule (the "Commission Reduction Rule") reinforces the Buyer

Broker Commission Rule by requiring that any reduction in either Buyer Broker commission or

total broker commission negotiated between the Seller and Seller Broker come entirely out of the

Seller Broker's own pocket unless the Buyer Broker agrees in writing. The Commission Reduction

Rule, as stated in Article IV, Section 2.A. of the REBNY rules, appears below:

> Negotiations Involving Reductions in Commissions. Any negotiation of the
> reduction of a brokerage commission must be done with both the Exclusive Broker
> [*i.e.*, the Seller Broker] and the Co-Broker's [*i.e.*, the Buyer Broker] written
> approval of the commission reduction. If the Exclusive Broker negotiates a reduced
> commission with the Owner [*i.e.*, the Seller] without the written approval of the
> Co-Broker, the Exclusive Broker must absorb the full amount of the commission
> reduction.

53.     REBNY's Code of Ethics and Professional Responsibility (the "Code of Ethics")

(attached as Exhibit B) reinforces the Commission Reduction Rule stating that: "Any negotiation

of brokerage commissions must be done with each co-brokerage firm's approval of the

commission reduction. If a co-broker negotiates a reduced commission without the approval of a

---

[3] Article IV, Section 6.A., which encourages the Seller's attorney to "issue a separate commission check" to the Buyer Broker unless "one commission check is issued" by the Seller to the Seller Broker (to be shared with the Buyer Broker), similarly makes clear that the Seller pays both the Buyer Broker and Seller Broker commissions.

cooperating broker, the negotiating broker must absorb the full amount of the commission reduction."

### 3.     The RLS Listing Rule

54.     The REBNY Rules require Seller Brokers to issue all of their residential listings on the RLS.[4]  Under the rules, only REBNY member brokers (or non-members who agree to the REBNY Rules) can access the RLS.

55.      The REBNY Rules further require that RLS listings disclose the specific amount of Buyer Broker commission—called "Co-Broker's Commission"—in connection with the sale of any residential property (the "RLS Listing Rule").

### E.     Defendants' Agreement Not to Compete Over Buyer Broker Commissions in REBNY Brooklyn

56.     Through the Buyer Broker Commission Rule, the Commission Reduction Rule, and the RLS Listing Rule (collectively, the "Broker Commission Allocation Rules"), Defendants agreed not to compete over Buyer Broker commissions in REBNY Brooklyn.

57.     The Buyer Broker Commission Rule imposes a mandatory default where, in each and every residential real estate transaction in REBNY Brooklyn, the Seller Broker and the Buyer Broker split the commission 50/50—the entirety of which is paid by the Seller—without regard for the Buyer Broker's time, effort, skill, reputation, or any other factor that would bear on price in a normally functioning competitive market.  This mandatory default bars any and all competition over the price of Buyer Broker commissions.

---

[4] While Article I, Section 5 nominally allows "Pocket Listings" (which are only "selectively co-brokered" and not broadly advertised) to be withheld from the RLS, the REBNY Rules make clear that such listings are to be extremely limited; brokers may not "promote or encourage" the use of Pocket Listings to Sellers, and a broker who is "suspected of having engaged in a pattern or practice of encouraging Owners to withhold Pocket Listings from the RLS" is subject to discipline by REBNY.

58.     Requiring Sellers to pay the Buyer Broker commission in the first instance further undermines any prospect of competition.  Buyer Brokers have no reason to compete on price when seeking to represent Buyers, who are indifferent to the amount of commission paid to the Buyer Brokers, given that it is paid by Sellers.

59.     Although the Buyer Broker Commission Rule theoretically allows for a lesser Buyer Broker commission pursuant to a written agreement between the Seller and the Seller Broker, the Commission Reduction Rule makes the prospect of such an agreement irrational and helps cement a 50/50 allocation in virtually all instances.  A typical Buyer Broker does not voluntarily reduce his or her compensation from the mandatory default.  And a typical Seller Broker does not independently agree to a Seller demand of a lower Buyer Broker commission, or total broker commission, because the reduction will come entirely out of the Seller Broker's pocket.

60.     Moreover, there is not a single designated Buyer Broker with whom to negotiate a reduction with until an offer is accepted and the property is under contract.  At that point, it is irrational to agree to something less than the Seller has already agreed to pay.

61.     Although the Buyer Broker Commission Rule theoretically allows for a lesser Buyer Broker commission to be set forth in an RLS listing, a Buyer Broker will typically steer Buyers away from those listings.  For example, if there are two properties listed for sale at $2 million, and one Seller offers a Buyer Broker commission of 3%, while the other offers a Buyer Broker Commission of 2%, the Buyer Broker receives $20,000 more if the Buyer purchases the property with the higher commission.

62.     In any event, the RLS Listing Rule requires Buyer Broker commissions to be set at the time of listing, amounting to blanket unilateral offers in all instances.

63.     The mandatory default 50/50 split has been expressly interpreted and deployed by REBNY members to be both a hard-and-fast rule and an industry norm.  For example, the Castle Avenue Team of Broker Defendant R New York unequivocally states the following on its website:

> In New York real estate, the broker commission for both the seller's agent and buyer's agent come[s] from the seller.  The entire broker commission is already pre-determined before a property is listed on the market.  If the buyer has a broker, this commission gets split 50/50 between the two agents.[5]

64.     In June 2023, Tara King Brown of Broker Defendant Corcoran told well-known New York real estate blog *Brick Underground* that the REBNY Rules require REBNY members to co-broker their listings, which "involves sharing the information and also the fee so it's a cooperative process from start to finish."[6]  She further states that, as a REBNY member, she has "the responsibility and commitment to share [an exclusive] listing with all other agents and ultimately share the fee with the buy-side agent."  *Brick Underground* notes a 50/50 allocation of the commission—"for example, each agent would take 3 percent of a 6 percent fee."

65.     Non-Defendant brokers also state that REBNY rules require a 50/50 allocation.  For example, according to the website of ELIKA New York, which only represents buyers:

> Based on the Real Estate Board of New York, NYC's sales commission is about 5-6%.  Like all other real estate agents, Elika agents earn their living through this commission, which is paid at closing out of the sale proceeds.  This is then split 50/50 between the listing brokerage and the buyer's brokerage.  It's an unavoidable part of any transaction and will still have to be paid even if you go without agent representation.[7]

66.     According to non-Defendant broker DIGS Realty Group, "[a]ll members of REBNY are required to sign the Universal Co-Brokerage Agreement [the REBNY Rules].  This

---

[5] Wei Min Tan, *A Buyer's Broker for Manhattan Condominiums,* Castle Avenue Team at R New York (Aug. 15, 2022), https://www.castle-avenue.com/buyer-broker-new-york-property.html.
[6] Evelyn Battaglia, *What Does 'Co-Broking' Mean When You're Buying an Apartment or a House?*, Brick Underground (June 1, 2023), https://www.brickunderground.com/sell/what-does-co-broking-mean.
[7] Elika, *Most Common Home Buyers Questions*, https://elikarealestate.com/questions/ (last visited Dec. 28, 2023).

agreement, among other things, obligates all REBNY brokers to work with all other REBNY brokers and share commissions 50/50."[8]

67.     Non-Defendant broker Hauseit, on its website, notes that Article IV, Section 1 of the REBNY Rules "means that a REBNY member listing agent may not keep more than 50% of the total commission paid by a seller in the event that the buyer is represented by a broker who is a RENBY member."[9]

68.     As a result, there is almost never a departure from the 50/50 split in practice.  A 2022 CFA study found that 85.6% of residential real estate transactions in REBNY Brooklyn had Buyer Broker commissions of between 2.5% to 3.0%—precisely half of the total 5-6% broker commission.[10]  The CFA study concluded:

> The New York Real Estate Board (REBNY), which dominates sales in . . . the brownstone areas of Brooklyn nearest Manhattan, operates to an extent as a club with a norm that sales will be co-brokered for a total commission ranging from five to six percent and with a requirement that listing brokers offer buyer brokers half of commissions.[11]

69.     In short, the Broker Commission Allocation Rules work together to prevent price competition for real estate broker services in REBNY Brooklyn.

70.     In a competitive market, Buyers, not Sellers, would negotiate and pay Buyer Broker fees.  Indeed, in markets outside the United States where Buyers negotiate with and pay their brokers, total commissions and Buyer Broker Commissions are substantially less than they are in REBNY Brooklyn.  And right next door, in Brooklyn MLS-dominated neighborhoods where there

---

[8] Digs Realty Group, *Track Record Proves Traditional Brokers Work With Rebate Brokers and Discount Brokers,* https://www.digsrealtynyc.com/2019/06/14/track-record-proves-traditional-brokers-work-with-rebate-brokers-and-discount-brokers/ (last visited Dec. 28, 2023).

[9] Sonja Gosine, *Mandatory Co-Broking,* Hauseit, https://www.hauseit.com/rebny-rls-universal-co-brokerage-agreement-rules-and-regulations/#Mandatory%20Co-Broking (last visited Dec. 28, 2023).

[10] Stephen Brobeck, *Diverse Real Estate Commissions: The New York City Residential Brokerage Anomaly* at 4, *supra* note 1.

[11] *Id.* at 17.

is no required Buyer Broker commission, the median Buyer Broker commission is 1%, far below the 2.5-3% paid to Buyer Brokers in REBNY Brooklyn.

71.     Notably, the REBNY Rules contain disciplinary provisions that enforce Defendants' conspiracy.  For example, if a REBNY member violates the REBNY Rules, the rules give REBNY the authority to impose fines and potentially suspend or expel members from the RLS and REBNY.

72.     Given that brokers seeking to do substantial business in REBNY Brooklyn need access to the RLS, the threat of losing that access is a particularly powerful tool to discipline efforts by REBNY members to contravene the Broker Commission Allocation Rules and compete over Buyer Broker commissions.

73.     While non-members of REBNY who are not bound by the REBNY Rules could theoretically offer Buyer Broker commissions in REBNY Brooklyn at lower rates, they fail to do so because they are excluded from RLS listings.  REBNY is therefore able to wield the threat of exclusion from RLS to insulate its membership from those who may seek to compete over Buyer Broker commissions.

74.     Unlike other MLSs that funnel listings to multiple online third-party sources, the primary public source for REBNY Brooklyn/RLS listings is a REBNY-controlled website, Citysnap.com, whose website states that it is "Powered by RLS at REBNY."  Before 2022, when Citysnap launched, Buyers had no way to search the RLS directly.

75.     To the extent Buyers seeking to purchase a home in REBNY Brooklyn access Citysnap to assist in their search, they are presented with RLS listings that were placed on the RLS by a REBNY member pursuant to the REBNY Rules, including the Broker Commission Allocation Rules that effectively prohibit negotiation of Buyer Broker commissions after a listing is

disseminated on RLS.[12]  And if a Buyer were to use Citysnap to research and purchase a home without a Buyer Broker, the Seller Broker nonetheless receives the total broker commission noted in the listing.

76.     The Broker Defendants are further incentivized to adhere to the mandatory default 50/50 allocation by virtue of their business model representing both Sellers and Buyers in REBNY Brooklyn.  The Broker Defendants want to close as many residential real estate transactions as quickly as possible.  Maintaining the mandatory default 50/50 allocation ensures they can do so while maintaining inflated Buyer Broker commissions.[13]

77.     At least one analysis of real estate commissions has noted the persistence of traditional or "typical" 50/50 commission splits as due in part to brokers' fear of retaliation or blacklisting for offering discounted commissions.  The analysis found that, based on a review of residential transaction data, "dominant" real estate brokers and agents (like the Broker Defendants here) "are less likely to purchase low commission rate listings."[14]  Therefore, rather than competing over Buyer Broker commissions, the Broker Defendants have fostered an environment in which their earnings are maximized regardless of whether they represent the Buyer or the Seller.

---

[12] While Citysnap currently (at least as of the date of this Complaint) provides information regarding "Buyer Broker Compensation" at the bottom of the list of a property's "Features," there is a "Buyer Agency Compensation Disclaimer" that renders the purported disclosure effectively meaningless: "This information is not guaranteed, should be independently verified and may not reflect all real estate activity in the market.  Offers of compensation set forth here are for other RLS Participants only and may not reflect other agreements between a consumer and their broker."  Thus, the true amount of Buyer Broker commission offered for a particular property through Citysnap remains opaque.

[13] A Buyer Broker has an obvious interest in maximizing her or his compensation.  The Seller Broker, in addition to seeking to foster a cooperative environment in contemplation of a different role in future transactions representing Buyers, is motivated to maintain the 50/50 split to ensure a greater probability of success on the sale as "[l]isting brokers also injure the interests of sellers when they offer non-traditional brokers only 'adverse splits,' *i.e.*, less than a 50/50 split or even nothing at all."  Mark S. Nadel, *A Critical Assessment of the Traditional Residential Real Estate Broker Commission Rate Structure*, 5 Cornell Real Estate R. 1, 35 (2007).  *See also id.* at 28, n.180 (noting that, for example, the NAR's handbook advises agents to set commission splits that are "designed to 'encourage cooperation' as opposed to competition").

[14] Panle Jie Barwick, Parag A. Pathak & Maisy Wong, *Conflicts of Interest and the Realtor Commission Puzzle*, NAT'L BUREAU OF ECON. RESEARCH WORKING PAPER SERIES (2015), at 4-5, 20, n.31, https://www.nber.org/papers/w21489.

78.     The Code of Ethics reinforces this.  Section II.A(8) provides that REBNY members shall "seek no unfair advantage over other Members and conduct their business so as to avoid controversies with other members."  Thus, a REBNY member seeking to reduce or eliminate a Buyer Broker Commission likely would invite controversy with other members, including the Broker Defendants, who have a demonstrated interest in maintaining Buyer Broker Commissions at supracompetitive levels.[15]

79.      In any event, even if there were meaningful competition over Buyer Broker commissions, the Broker Commission Allocation Rules still effectively require the Seller to make a blanket, unilateral offer of *some* Buyer Broker commission in the RLS listing, without regard for the time, effort, reputation, or skill ultimately provided by the Buyer Broker.  If the listed Buyer Broker commission is $0, no rational Buyer Broker would pursue the listing, and, under the mandatory 50/50 default allocation, the Seller Broker commission would implausibly be $0.

**F.     Rules Similar To The Buyer Broker Commission Rule Have Been Found To Be Anticompetitive**

80.     The NAR and MLS Property Information Network, Inc. ("MLS PIN") have adopted rules similar to the REBNY Rules, including the Broker Commission Allocation Rules.

81.     A jury has already found NAR and several brokerage firms liable for violating federal and state antitrust laws in a case with allegations substantially similar to those in this complaint.[16]

82.     Like REBNY, both NAR and MLS PIN established rules that require Sellers to make blanket, unilateral, and effectively non-negotiable offers of compensation to Buyer Brokers whenever Seller Brokers list a home for sale on an MLS.  If a Buyer represented by a Buyer Broker

---

[15] The REBNY website encourages members to report other members' violations of the Code of Ethics or the REBNY Rules, including pertaining to listings on the RLS. *See* https://www.rebny.com/compliance/.

[16] *Sitzer et al. v. Nat'l Ass'n of Realtors, et al.*, 19-cv-00332-SRB (W.D. Mo. 2019).

purchases a home under such a non-negotiable offer of compensation, then the Buyer Broker receives the offered compensation as outlined in the applicable listing agreement.

### 1.    NAR's Buyer Broker Commission Rule

83.    NAR is a national trade association that advocates for the interests of real estate brokers throughout the United States.  NAR has 1.5 million members, fifty-four state and territorial realtor associations, and over 1,200 local realtor associations.

84.    NAR adopts rules that govern its members through its Handbook on Multiple Listing Policy (the "NAR Handbook") and Code of Ethics.

85.    NAR's version of the Buyer Broker Commission Rule (the "NAR Buyer Broker Commission Rule") is described in Section 2-G-1 of the NAR Handbook, which provides, in relevant part:

> In filing property with the multiple listing service, participants make blanket unilateral offers of compensation to the other MLS participants and shall therefore specify on each listing filed with the service the compensation being offered by the listing broker to the other MLS participants . . . . Multiple listing services shall not publish listings that do not include an offer of compensation expressed as a percentage of the gross selling price or as a definite dollar amount, nor shall they include general invitations by listing broker to other participants to discuss terms and conditions of possible cooperative relationships.[17]

86.    NAR Code of Ethics, Standard of Practice 16-15 requires Sellers to offer compensation to Buyer Brokers by providing that "[i]n cooperative transactions REALTORS® shall compensate cooperator REALTORS®."[18]

87.    NAR's Code of Ethics, Standard Practice 16-16 reinforces the NAR Buyer Broker Commission Rule by preventing a buyer from making an offer to purchase a home conditional on a reduction of the buyer's broker commission, stating as follows:

---

[17] NAR, *2023 Handbook* (2023), https://www.nar.realtor/handbook-on-multiple-listing-policy.
[18] NAR, *Code of Ethics and Standards of Practice of the National Association of Realtors*, https://cdn.nar.realtor/sites/default/files/documents/2024-nar-coe-standards-of-practice-2023-12-21.pdf?_gl=1*1eh0f1r*_gcl_au*NzAzNzEwMTc3LjE3MDM4MTYwMzI.

REALTORS®, acting as subagents or buyer/tenant representatives or brokers, shall not use the terms of an offer to purchase/lease to attempt to modify the listing broker's offer of compensation to subagents or buyer/tenant representatives or brokers nor make the submission of an executed offer to purchase/lease contingent on the listing broker's agreement to modify the offer of compensation.[19]

### 2.    MLS PIN's Buyer Broker Commission Rule

88.    MLS PIN is an association of realtors that owns and operates Pinergy, an MLS that is open to brokers and salespersons licensed in Massachusetts, New Hampshire, Connecticut, Rhode Island, Maine, Vermont, and New York.

89.    Section 5 of the MLS PIN Rules (the "MLS PIN Buyer Broker Commission Rule") requires any broker listing a property on Pinergy to offer compensation to buyer's brokers, stating, in part:

Listing Broker shall specify, on each Listing Filed with the Service, the compensation offered to other Participants for their services as Cooperating Brokers in the sale, lease or rental of the Listed Property.  Such offers shall be unconditional, except that entitlement to compensation shall be conditioned on the Cooperating Broker's performance as the procuring cause of the sale, lease or rental.[20]

90.    Note 1 to Section 5 of the MLS PIN Rules further provides, in part:

In Filing a Listing with the Service, a Participant is deemed to be making blanket unilateral offers of compensation to the other Participants in the Service.  The Participant therefore shall specify on each Listing Filed with the Service the compensation being offered to the other Participants.[21]

### 3.    The Broker Commission Allocation Rules Are Indistinguishable from, and, if Anything, More Anticompetitive Than the NAR Buyer Broker Commission Rule and the MLS PIN Buyer Broker Commission Rule

91.    The Broker Commission Allocation Rules at issue in this action are distinguishable from the NAR Buyer Broker Commission Rule or the MLS PIN Buyer Broker Commission Rule

---

[19] *Id.*
[20] MLS Pin, *Complete Rules & Regulations,* https://www.mlspin.com/resources/rules-regulations/complete-rules-regulations (last visited Dec. 28, 2023).
[21] *Id.*

only in that the Broker Commission Allocation Rules are *more* anticompetitive than the NAR rules that have already been found by a jury violate antitrust laws.

92.     REBNY's Broker Commission Allocation Rules, like the NAR Buyer Broker Commission Rule and the MLS PIN Buyer Broker Commission Rule, requires Sellers. through Seller Brokers, to make unilateral, blanket offers of compensation to Buyer Brokers when listing homes for sale on RLS.

93.     But unlike the NAR Buyer Broker Commission Rule and the MLS PIN Buyer Broker Commission Rule, REBNY's Broker Commission Allocation Rules establish a mandatory default that the compensation paid by the Seller to the Buyer Broker and Seller Broker be allocated equally, and that any reduction in Buyer Broker compensation negotiated between the Seller and Seller Broker come out of the Seller Broker's pocket.

94.     This creates a unique conflict of interest between the Seller Broker and the Seller. Because the Broker Commission Allocation Rules bar a reduction in the Buyer Broker's commission alone, the Seller Broker—who is supposed to be acting in the Seller's best interest—is incentivized to maintain high levels of total Broker commissions to maximize the Seller Broker's commission.

**G.     REBNY'S Announcement That It Is Abandoning the Buyer Broker Commission Rule**

95.     In October 2023, in the wake of increased scrutiny of Buyer Broker commissions in the U.S. real estate industry, including a DOJ investigation and allegations of anticompetitive conduct, REBNY announced that, effective January 1, 2024, the Buyer Broker Commission Rule will no longer be in effect.  The rule will be amended to require that any offers of compensation

to Buyer Brokers come from Sellers themselves, not the Seller Broker, and to eliminate the mandatory 50/50 default allocation.[22]

96.     While these changes, if carried out and enforced, may eliminate the mandatory default 50/50 allocation, absent injunctive relief, harm from the anticompetitive conduct alleged herein will continue, and Sellers will continue to pay supra-competitive Buyer Broker commissions.

97.     Further, REBNY has made clear that the RLS Listing Rule and Commission Reduction Rule will remain in effect.  Offers of Buyer Broker commission will therefore remain blanket, unilateral offers that can only be altered with written approval of the Buyer Broker.  And the Buyer Broker steering remains alive and well.

## V.      RELEVANT MARKET AND DEFENDANTS' MARKET POWER

98.     The relevant antitrust market[23] for the claims asserted herein is the bundle of residential real estate services provided Sellers and Buyers of residential real estate in REBNY Brooklyn by REBNY member residential real estate brokers and agents with RLS access. Defendants' control over the RLS, combined with the agreement to abide by the REBNY Rules, gives Defendants the ability to impose the Buyer Broker Commission Rule and other

---

[22] In explaining this change, REBNY implausibly contends that the application of 50/50 commission splits was due to "[s]ome brokers and agents [who] have misinterpreted the UCBA to provide a standard 50/50 split for all commissions in the RLS" and otherwise provide for a "failsafe provision" to address "rare occasion[s]" where there is "'absolutely nothing in writing on what the selling agent gets, and what is offered to the buyer's agent.'"  REBY, *Decoupling Commissions FAQ* (Oct. 10, 2023), https://www.rebny.com/articles/decoupling-commissions-faq/. These assertions are belied by both the plain language of the Broker Commission Allocation Rules themselves— mandating a default "equal share" of commissions that can only be altered if the Buyer Broker wishes to voluntarily reduce his or her own compensation—statements from major REBNY members that the 50/50 split is an ironclad rule, and established practice in REBNY Brooklyn, where co-brokered listings almost never, if ever, deviate from the default rule.

[23] By alleging facts concerning the relevant market and market power, Plaintiff does not concede that his burden of proof includes proof of a relevant market or proof of market power beyond the actual adverse effect of artificially inflated broker costs borne by Plaintiff and the Class.

anticompetitive rules on Class members and other market participants. Access to the RLS is critical for brokers and agents to access and assist both Sellers and Buyers in REBNY Brooklyn.

99.     The relevant geographic market for the claims asserted herein is no broader than REBNY Brooklyn, as defined above. Nearly all residential real estate properties sold in REBNY Brooklyn were listed on the RLS by brokers that have knowingly agreed to the REBNY Rules. Most Sellers in REBNY Brooklyn prefer to work with a REBNY broker who is familiar with local market conditions unique to those neighborhoods and who maintains an office or affiliated sales associates within a reasonable distance of the Seller's property. Likewise, most Buyers who seek to purchase residential real estate in REBNY Brooklyn typically prefer to work with a REBNY broker who has experience with and knowledge of the residential real estate market in REBNY Brooklyn.

100.     The Broker Defendants, through their agents and/or franchisees or other conspiring brokers in REBNY Brooklyn, collectively provide the vast majority, if not the entirety, of residential real estate broker services in REBNY Brooklyn.

101.     Defendants and their co-conspirators collectively have market power in REBNY Brooklyn through their control of the RLS and their dominant share of the residential real estate market in REBNY Brooklyn.

102.     Any Seller Broker or Buyer Broker in the RLS area who seeks to compete outside of Defendants' unlawful agreement would face insurmountable barriers to competition. Brokers cannot conduct business effectively and participate in the REBNY Brooklyn market without access to the RLS.

103.     Any Buyer Broker who is not a member of REBNY seeking to operate in REBNY Brooklyn faces insurmountable barriers through, *inter alia*, Defendants' control over the RLS. A

Buyer Broker who does not agree to the REBNY Rules cannot access the RLS, meaning the Buyer Broker cannot access the vast majority of properties being offered for sale in REBNY Brooklyn. Defendants' control of the RLS also means that non-conspiring brokers would need to establish an alternative listing service to compete with the conspiring brokers or, alternatively, attempt to compete without access to RLS.

104.    A Seller Broker who represents a Seller without using the RLS and agreeing to the REBNY Rules would lose access to the large majority of potential Buyers seeking to purchase a property in REBNY Brooklyn.

105.    For an alternative listing service to compete effectively with the RLS, the alternative would need to have listings covering REBNY Brooklyn that are as comprehensive (or at least nearly as comprehensive) as the RLS.  Brokers, including the Broker Defendants and their individual agents, who currently profit from inflated Buyer Broker commissions and total commissions have minimal incentive to participate in an alternative listing service that would generate lower Buyer Broker commissions and lower total commissions.  And many Buyers seeking to purchase a property in REBNY Brooklyn would be reluctant to retain a Buyer Broker operating on an alternative listing service that required the Buyer to pay the Buyer Broker Commission when other Buyer Brokers operating on the RLS are entirely compensated by Sellers. Accordingly, Seller Brokers on an alternative listing service would struggle to attract Buyer Brokers and their Buyer clients.

106.    Sellers in REBNY Brooklyn would not retain brokers that use a new, unfamiliar alternative listing service that had no track record of success in REBNY Brooklyn and had failed to attract sufficient Buyers and Buyer Brokers.  Accordingly, a listing service attempting to

compete with the RLS in REBNY Brooklyn would likely fail to attract enough property listings to operate profitably and be a competitive check on the incumbent RLS.

107.    Listing on the existing Brooklyn MLS would not yield the same sale prices for Sellers, nor as high a commission for Seller Brokers, because REBNY has succeeded in dividing Brooklyn into two markets: the supracompetitively priced RENBY Brooklyn market and the Brooklyn MLS market.  Buyers looking for, and able to afford, homes in REBNY Brooklyn are not looking at Brooklyn MLS for those homes.  Seller Brokers posting homes from REBNY Brooklyn on Brooklyn MLS exclusively will be unable to attract as competitive offers, or secure as favorable purchase prices for their customers, as Seller Brokers with access to RLS.

108.    The absence of listing services that compete directly with the RLS in REBNY Brooklyn reflects the very substantial barriers to entry.

**VI.     ANTICOMPETITIVE EFFECTS OF DEFENDANTS' CONSPIRACY**

109.    Defendants' unlawful agreement to abide by and enforce the Broker Commission Allocation Rules has caused, and is causing, significant anticompetitive effects in the residential real estate market in REBNY Brooklyn by artificially inflating the total broker costs paid by the Seller.

110.    First, Defendants have agreed to abide by the Buyer Broker Commission Rule (Article IV, Section 1 of the REBNY Rules), which forces Sellers to pay Buyer Broker commissions.  That is, Sellers must pay their negotiating adversaries, which substantially and artificially inflates the transaction costs associated with selling their homes.

111.    Second, Defendants have agreed to constrain price competition among Buyer Brokers by adhering to the default 50/50 allocation of broker commission in the Buyer Broker Commission Rule.  That is, not only are Sellers compelled to pay their adversary's agents'

commissions, they are compelled to pay *high* Buyer Broker commissions—typically 2.5% to 3%—resulting from the lack of competition among Buyer's Brokers to obtain Buyers as clients.

112.    Third, the RLS Listing Rule (Article I, Section 5 of the REBNY Rules) creates an incentive for Buyer Brokers to steer Buyers toward listings that offer higher Buyer Broker commissions.  That rule requires Sellers to disclose Buyer Broker commissions on RLS.  This all but compels a Seller to agree to offer higher Broker commissions, so that Buyer Brokers do not steer Buyers away from the Seller's property and toward those with higher commissions.  Such steering, which is prevalent in REBNY Brooklyn, perpetuates supracompetitive Buyer Broker commissions.[24]

113.    Fourth, Defendants have agreed to fix Buyer Broker commission prices by agreeing to abide by the Commission Reduction Rule (Article IV, Section 2.A of the REBNY Rules).  That rule mandates that, once a Buyer Broker commission is published on RLS, it may not be reduced without the written approval of the Buyer Broker.  If a Seller wishes to reduce the Buyer Broker commission unilaterally, the Seller Broker "must absorb the full amount of the commission reduction."

114.    This provision serves to not only fix Buyer Broker commissions, it enforces Defendants' agreement.  A Buyer Broker is unlikely to agree to a commission lower than the one initially offered.  By the time there is a single Buyer Broker with whom a Seller Broker could *try* to negotiate a reduced commission, the Buyer Broker has already agreed to the commission listed on the RLS.

---

[24] *See, e.g.*, Jordan M. Barry et al., *Et Tu, Agent? Commission-Based Steering in Residential Real Estate* (Oct. 18, 2023), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4596391#:~:text=Analyzing%20a%20new%20dataset%2C%20we,helping%20their%20clients%20find%20homes; Bradford W. Muller, *Encouraging Price Competition Among New Jersey's Residential Real Estate Brokers*, 39 SETON HALL L. REV. 665, 682-84 (2009); Panle Jie Barwick, Parag A. Pathak & Maisy Wong, *Conflicts of Interest and the Realtor Commission Puzzle*, NAT'L BUREAU OF ECON. RESEARCH WORKING PAPER SERIES (2015), http://www.nber.org/papers/w21489.

115.    The Commission Reduction Rule likewise punishes Seller Brokers that agree to reduce the total broker commission—which would effectively lower the cost of the home—by making the Seller Broker bear the full brunt of the reduction.

116.    This provision forecloses common means of competition between Buyers and Sellers in the market.  For example, a Seller who is having trouble selling a home listed on the RLS cannot unilaterally reduce the total amount of broker commission to offer a more competitive overall sale price.

117.    Fifth, Defendants have agreed to constrain competition among Buyer Brokers by preventing (i) Buyer Brokers from competing for Buyers by offering to accept lower Buyer Broker commissions; and (ii) preventing Buyer Brokers from making their clients' offers more attractive to Sellers by lowering the Buyer Broker commission.

118.    The anticompetitive effects of the Broker Commission Allocation Rules harm Sellers and enrich Brokers.  Broker Defendants have increased their profits substantially by receiving inflated Buyer Broker commissions and inflated total commissions.  Defendants' conspiracy results in Buyer Broker fees being inflated and fixed by their self-interested agreement, rather than the competitive forces of a free and fair market. Horizontal restraints like this are a *per se* violation of the federal antitrust laws.

119.    Regardless, the Broker Commission Allocation Rules confer no pro-competitive effect on the market.  REBNY itself now acknowledges that the Buyer Broker Commission Rule is not "efficient and fair" and that disclosures of Buyer Broker commissions on the RLS are not "efficient and transparent."

120.    The Broker Commission Allocation Rules are a cohesive, and segregable, component of REBNY's broader rules. They function synergistically together to raise and fix

Buyer Broker commissions.  And they do not enhance (and instead detract from) the services provided to Sellers in REBNY Brooklyn.  None of the essential functions of the RLS "has anything to do with interbroker compensation.  In fact, [it] could continue providing every service of significance [it] provide[s] without addressing compensation at all."[25]  Accordingly, the Broker Commission Allocation Rules—which themselves have no procompetitive qualities—cannot be judged against purported procompetitive justifications for other REBNY Rules.

121.    Even assuming that Defendants raise any purported pro-competitive effects to justify their conduct, such claimed effects are substantially outweighed by the unlawful agreements and/or conspiracy's anti-competitive effects.  "There is no longer any reason to permit listing brokers to set the default prices that these competing buyers' brokers charge to serve their own customers."[26]

122.    Total brokers' commissions in REBNY Brooklyn average between 5% and 6%. This figure is substantially higher than in other industrialized countries, where total commissions range from 0.5-0.75% (in low priced areas of the United Kingdom) to 3.14% (in New Zealand and South Africa).  Moreover, Buyer Broker Commissions in REBNY Brooklyn are substantially higher even than in other Brooklyn Neighborhoods dominated by Brooklyn MLS because, as the CFA found, "Brooklyn MLS does not require its members to offer *any* compensation" to Buyer Brokers and "Brooklyn MLS Brokers tend to be more price competitive and less cooperative with other brokers than are REBNY brokers."[27]

---

[25] Brian N. Larson, *The End of MLS as We Know It (Redux) – Part III* , Larson Skinner (Jan. 5, 2011), https://larsonskinner.com/2011/01/05/the-end-of-mls-as-we-know-it-redux-part-iii/.
[26] Mark S. Nadel, *A Critical Assessment of the Traditional Residential Real Estate Broker Commission Rate Structure*, 64-65, *supra* note 13.
[27] Stephen Brobeck, *Diverse Real Estate Commissions: The New York City Residential Brokerage Anomaly*, CFA, at 6, *supra* note 1.

123.    For years, Buyer Broker commissions have remained steady in REBNY Brooklyn despite increasing home prices (that, in turn, increase the dollar amounts of commissions), the availability of free online sources like Zillow and Redfin that reduce Buyers' and Sellers' reliance on Brokers to list or search for available properties, and the diminishing role of Buyer Brokers after curtailment of the practice of "subagency" (in which brokers working with Buyers were legally considered agents of the Seller and thus obligated to represent the interests of the Seller). In 2005, a U.S. Government Accountability Office review of the residential real estate market in the United States reported that "commission rates have remained relatively uniform—regardless of market conditions, home prices, or the efforts required to sell a home."[28]   This remains especially true today in REBNY Brooklyn

124.    The adverse economic impact of Defendants' conspiracy on price competition in REBNY Brooklyn has been severe.  If sellers and buyers each separately negotiated compensation with their brokers, ubiquitous and uniform 5-6% total commissions would quickly disappear and Buyer Broker commissions would cease to be maintained at the 2.5-3% level.

## IV.    IMPACT ON INTERSTATE COMMERCE

125.    People from across the country and around the world move to REBNY Brooklyn for businesses or personal reasons.  When they do, they need to secure housing in REBNY Brooklyn.  Other homeowners may choose to leave REBNY Brooklyn for business or personal reasons.  When people move to and from REBNY Brooklyn, they often cross state lines.  In 2022 alone, 13,948 people moved to Brooklyn from outside of New York State.

---

[28] U.S. Gov't Accountability Office, GAO-05-947, Real Estate Brokerage: Factors That May Affect Price Competition, REPORT TO THE COMMITTEE ON FINANCIAL SERVICES, HOUSE OF REPRESENTATIVES 1, 1 (2005)

126.     During the Class Period (defined below), the Broker Defendants facilitated the purchase and sale of real estate to customers not just moving within New York to and from REBNY Brooklyn, but also across state lines.  This has a substantial effect on interstate commerce. The anticompetitive, price-fixed Buyer Broker commissions extracted from Sellers by and through Defendants' conspiracy were tied to those interstate moves.

127.     Furthermore, when a residential real estate property is purchased or sold, money in the form of downpayments, closing costs, and Broker Fees are processed by banks; those banks move the funds through the stream of interstate commerce. Accordingly, the anticompetitive Buyer Broker commissions secured through Defendants' conspiracy have flowed through interstate commerce before reaching the Buyer Brokers' pockets.

128.     Accordingly, Defendants' unlawful and anticompetitive conduct affects the purchase and sale of hundreds of millions, if not billions of dollars in interstate commerce.

## V.     CLASS ACTION ALLEGATIONS

129.     Pursuant to Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of himself and the following Class:

> All persons or entities that sold residential real estate in REBNY Brooklyn using the services of a Broker Defendant and paid a Buyer Broker Commission in accordance with the REBNY Rules from December 29, 2019 to the present.

130.     Excluded from the Class are Defendants and their officers, directors, and agents, the judicial officers presiding over this action and the members of their immediate families, the judicial staff, Plaintiff's counsel, and employees of their law firms.

131.     The Class is readily ascertainable because records of the relevant transactions exist.

132.     Due to the nature of the trade and commerce involved, Plaintiff believes that the class has many thousands of members, the exact number and their identities being known to Defendants.

133.     Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff's interests are aligned with, and not antagonistic to, those of the other members of the Class.

134.     There are questions of law and fact common to the members of the Class, including, but not limited to, the following:

  a.   Whether REBNY Brookly constitutes a cognizable antitrust market;

  b.   Whether Defendants entered into one or more unlawful agreements or a conspiracy;

  c.   Whether Defendants used RLS to facilitate that conspiracy;

  d.   Whether requiring brokers to agree to and abide by REBNY rules as a precondition to gaining access to listings in REBNY Brooklyn had the effect of restricting competition;

  e.   Whether the conspiracy affected all, or substantially all, properties in REBNY Brooklyn;

  f.   Whether the REBNY Rules raised the commission prices Sellers in REBNY Brooklyn above a competitive level;

  g.   Whether the unlawful agreement(s) or conspiracy harmed competition in REBNY Brooklyn;

  h.   Whether Buyer Broker commissions and total broker commissions were inflated as a result of the unlawful agreement(s) or conspiracy in REBNY Brooklyn;

     i.   Whether Defendants' agreements constitute a *per se* violation of the federal antitrust laws;

     j.   If not, whether Defendants can muster any procompetitive justification for their anticompetitive agreements;

     k.   If so, whether the competitive harm from the unlawful agreement(s) or conspiracy substantially outweighs any competitive benefits;

     l.   Whether Plaintiff and the Class have been, and are continuing to be, harmed by Defendants' unlawful conspiracy;

135.    Plaintiff has retained counsel competent and experienced in the prosecution of antitrust class action litigation to represent him and the Class.

136.    Questions of law or fact that are common to the members of the Class predominate over any questions affecting only individual members of the Class.

137.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The prosecution of separate actions by individual members of the Class would impose heavy burdens on the Court and Defendants and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class.  A class action, on the other hand, would achieve substantial economies of time, effort, and expense and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.  Absent a class action, it would not be feasible for the vast majority of the members of the Class to seek redress for the violations of law alleged herein.

## VI.    CLAIMS FOR RELIEF

### COUNT I

**VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1**
**(Against All Defendants)**

138.    Plaintiff realleges each and every allegation above and incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

139.    Beginning more than four years before the filing of this Complaint, Defendants engaged in a continuing contract, combination, or conspiracy to unreasonable restrain interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

140.    The contract, combination, or conspiracy alleged herein has consisted of continuing agreement(s) among Defendants and their co-conspirators to require Sellers to pay the Buyer Broker and to pay an inflated Buyer Broker commissions.

141.    In furtherance of the contract, combination, or conspiracy, Defendants and their co-conspirators have committed one or more of the following over acts:

a)   Participated in the establishment, implementation, and enforcement of the Broker Commission Allocation Rules and other anticompetitive rules;

b)   Participated in the establishment, implementation, and enforcement of the REBNY Rules that implemented the Broker Commission Allocation Rules and other anticompetitive rules in REBNY Brooklyn; and

c)   Included provisions in franchise agreements, policy manuals, and other corporate agreements with franchises, affiliates, and realtors of Defendants that required the implementation of and adherence of the Broker Commission Allocation Rules and other anticompetitive rules in REBNY Brooklyn.

142.    In REBNY Brooklyn, Defendants' conspiracy has required Sellers to pay Buyer Broker commissions, to pay an inflated Buyer Broker commissions and total broker commissions, and has restrained price competition among Buyer Brokers. This harm to competition substantially outweighs any competitive benefits arising from the conspiracy.

143.    Defendants' unlawful agreements and/or conspiracy has caused Buyer Broker commissions and total broker commission in REBNY Brooklyn to be inflated. Plaintiff and the other members of the Class paid these inflated commissions during (and before) the last four years in connection with the sale of residential real estate listed in REBNY Brooklyn.

144.    Absent Defendants' conspiracy, Plaintiffs and the other class members would have paid substantially lower commissions because Buyer Brokers would have been paid by Buyers (and the Buyer Broker commissions would not be at supra-competitive levels).

145.    Defendants' unlawful agreement and/or conspiracy is a *per se* violation of Section 1 of the Sherman Act.

146.    In the alternative, Defendants' conspiracy violates Section 1 of the Sherman Act under a rule-of-reason analysis.

147.    As a direct and proximate result of Defendants' past and continuing violation of Section 1 of the Sherman Act, Plaintiffs and the other class members have been injured in their business and property and suffered damages in an amount to be proven at trial.

## COUNT II

### VIOLATION OF THE DONNELLY ACT,
### NEW YORK GENERAL BUSINESS LAW §340
### (Against all Defendants)

148.    Plaintiff realleges each and every allegation above and incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

149.     Defendants engaged in a continuing contract, combination, arrangement, or conspiracy to unreasonably restrain trade and commerce in violation of N.Y. Gen. Bus. §340.

150.     The contract, combination, arrangement, or conspiracy alleged herein has consisted of continuing agreement among Defendants and their co-conspirators to require Sellers to pay the Buyer Broker and to pay an inflated Buyer Broker commission.

151.     In furtherance of the contract, combination, arrangement, or conspiracy, Defendants have committed one or more of the following overt acts:

    a) Participated in the establishment, implementation, and enforcement of the Broker Commission Allocation Rules and other anticompetitive rules;

    b) Participated in the establishment, implementation, and enforcement of the REBNY Rules that implemented the Broker Commission Allocation Rules and other anticompetitive rules in REBNY Brooklyn; and

    c) Included provisions in franchise agreements, policy manuals, and other corporate agreements with franchises, affiliates, and realtors of Defendants that required the implementation of and adherence of the Broker Commission Allocation Rules and other anticompetitive rules in REBNY Brooklyn.

152.     In REBNY Brooklyn, Defendants' conspiracy has required Sellers to pay Buyer Brokers, to pay an inflated Buyer Broker commission and total commission, and has restrained price competition among Buyer Brokers.  This harm to competition substantially outweighs any competitive benefits arising from the conspiracy.

153.     Defendants' unlawful agreements and/or conspiracy has caused Buyer Broker commissions and total commission in REBNY Brooklyn to be inflated.  Plaintiffs and the other

members of the Class paid these inflated commissions during (and before) the last four years in connection with the sale of residential real estate listed in REBNY Brooklyn.

154. In the alternative, Defendants' conspiracy violates the Donnelly Act under a rule-of-reason analysis.

155. As a direct and proximate result of Defendants' past and continuing violation of N.Y. Gen. Bus. § 340, Plaintiffs and the other class members have been injured in their business and property and suffered damages in an amount to be proven at trial.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and members of the Class, respectfully requests judgment against the Defendants and the following relief:

A.    Entry of an order certifying the Class pursuant to Rules 23(a) and 23(b)(2) and/or (b)(3) of the Federal Rules of Civil Procedure;

D.    Entry of judgment against the Defendants holding the unlawful contract, combination, or conspiracy alleged herein is in violation of § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, and the Donnelly Act, N.Y. Gen. Bus. Law § 340;

E.    An award to Plaintiff and the Class of damages, to the maximum extent allowed under applicable laws, including entry of joint and several judgments in favor of Plaintiff and the Class against the Defendants in an amount to be trebled;

F.    Entry of an order permanently enjoining and restraining the Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act, on their behalf or in concert with them, from in any manner continuing, maintaining, or renewing the contract, combination, or conspiracy alleged herein, or from entering into any other conspiracy or combination having a

similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

G.    An award to Plaintiff and the Class of pre-and post-judgment interest as provided by law, to be awarded at the highest legal rate from after the date of the service of this Complaint;

H.    An award of Plaintiff's reasonable litigation expenses and attorneys' fees to the extent allowed by law; and

I.    Grant such other and further relief as the Court deems just and proper.

## VIII.  JURY TRIAL DEMAND

Plaintiff, individually and on behalf of all others similarly situated, demands a trial by jury on all issues so triable.

Dated: December 29, 2023

Respectfully submitted,

*/s/ Steven L. Groopman*

**BIENERT KATZMAN LITRELL WILLIAMS LLP**
Daniel Goldman
903 Calle Amanecer, Suite 350
San Clemente, California 92673
Telephone: (973) 476-5485
dgoldman@bklwlaw.com

**BERMAN TABACCO**

Steven L. Groopman
Steven J. Buttacavoli (*pro hac* forthcoming)
Kristie A. LaSalle (*pro hac* forthcoming)
Brooke E. Lowell
One Liberty Square
Boston, Massachusetts 02109
Telephone: (617) 542-8300
Facsimile: (617) 542-1194
sgroopman@bermantabacco.com
sbuttacavoli@bermantabacco.com
klasalle@bermantabacco.com
blowell@bermantabacco.com

**BERMAN TABACCO**
Todd A. Seaver (*pro hac* forthcoming)
Carl N. Hammarskjold (*pro hac* forthcoming)
425 California St, Suite 2300
San Francisco, CA 94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6382
tseaver@bermantabacco.com
chammarskjold@bermantabacco.com

*Counsel for Plaintiff and the Proposed Class*